FILED
2019 Apr-15 PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | |
|---|---|
| **SHIRLEY MCBRAYER FLOOD**, as **Personal Representative of the Estate of David Daniel McBrayer, deceased,** ] ] ] ] | |
| Plaintiff, ] ] | |
| v. ] ] | 1:16-cv-01832-ACA |
| **ALABAMA PEACE OFFICERS STANDARDS AND TRAINING COMMISSION, et al.,** ] ] ] ] | |
| Defendants. ] | |

## **MEMORANDUM OPINION**

This matter comes before the court on Defendant City of Jacksonville, Alabama's ("the City") motion for summary judgment. (Doc. 76).

In early November 2014, David Daniel McBrayer displayed symptoms of an undiagnosed mental illness. After being arrested for disorderly conduct, police officers noticed that Mr. McBrayer was acting strangely and called his father, telling him that Mr. McBrayer needed help for a mental illness. A few days after the police released Mr. McBrayer into his father's custody, a neighbor at Mr. McBrayer's apartment complex called the police to report that someone was shooting a BB gun into a car in the parking lot. When officers arrived, they found Mr. McBrayer in his apartment. As they started moving away, Mr. McBrayer left

his apartment, went to his car, and began to return to his apartment holding a box cutter. As he approached the area near the officers, he brandished the box cutter and yelled that he felt threatened by the officers. The officers responded by drawing their weapons and repeatedly ordering him to drop the "knife." Instead, he approached the officers, moving in the direction of his apartment, still holding out the box cutter, while yelling that he was going home. As the distance between Mr. McBrayer and one of the officers closed, the officer shot him five times, killing him almost instantly.

Mr. McBrayer's estate, through Ms. Flood, filed this lawsuit, asserting that the City failed to adequately train its police officers "to provide reasonable accommodations for mentally disabled citizens."[1] (Doc. 23 at 10–11). The City moves for summary judgment. (Doc. 76). The court **WILL GRANT** the motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the City and against Ms. Flood because Ms. Flood has not presented evidence from which a reasonable jury could find that the officer who shot Mr. McBrayer violated his constitutional rights.

I. **BACKGROUND**

On a motion for summary judgment, the court "draw[s] all inferences and review[s] all evidence in the light most favorable to the non-moving party."

---

[1] Ms. Flood had asserted other claims and named other defendants, but the only claim remaining in this case is the failure to train claim asserted against the City.

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012) (quotation marks omitted).

On November 8, 2014, Jacksonville Police Department Officers Gilbar and Lyons responded to a call about a possible attempt to break into a Dollar General and found Mr. McBrayer outside the store holding a hammer. (Doc. 76-3 at 14, 67). They arrested him for disorderly conduct and took him to the Jacksonville jail. (*Id.* at 14). Within six hours, Mr. McBrayer's strange behavior caused the jailors to suspect that he might have a mental illness. (*Id.* at 12, 16). As a result, a jailer named Jonathan Wilbanks called a county mental health officer, who was unable to report to the jail that night and recommended that Mr. Wilbanks call Mr. McBrayer's family. (*Id.* at 12).

On November 10, 2014, Mr. Wilbanks called Mr. McBrayer's father, Bradford McBrayer,[2] to tell him that his son was at the jail and needed "mental help." (Doc. 76-3 at 16; Doc. 80 at 20). Bradford McBrayer picked his son up from the jail late that night. (Doc. 80 at 20).

In total, Mr. McBrayer was held in the Jacksonville County Jail for about two days. (*See* Doc. 76-3 at 14; Doc. 80 at 20). Officer Dale Edwards worked both days, meaning that he might have "walked through the jail" and fed the three

---

[2] To avoid confusion, the court will refer to Bradford McBrayer by his full name ("Bradford McBrayer") and David McBrayer as "Mr. McBrayer."

3

inmates—including Mr. McBrayer—who were incarcerated on those days. (*See* Doc. 76-3 at 7, 33). Assistant Chief Gerald Wineman testified that "everybody in the jail" knew that Mr. McBrayer needed "mental help." (Doc. 76-3 at 16).

On November 12, two days after Mr. McBrayer's release from jail, one of Mr. McBrayer's neighbors, Lyssa Scott, called the police to report that Mr. McBrayer had shot another neighbor's car with a BB gun. (Doc. 80 at 7). The officers who responded told her that Mr. McBrayer "was mentally unstable and advised if he came back around to call the police."[3] (*Id.*). The parties dispute whether Officer Edwards was one of those officers, as Ms. Scott did not name them in the report. (*See* Doc. 81 at 8–9; Doc. 85 at 7–8). The court finds Ms. Flood has presented sufficient evidence from which a reasonable juror could infer that Officer Edwards was one of the officers who spoke with Ms. Scott. In

---

[3] The court draws this information from a report by an officer with the Alabama Bureau of Investigation recounting an interview with Ms. Scott. (*See* Doc. 80 at 7). The City objects to the use of the report on the basis that it is triple hearsay: a report about what a witness said someone else told her. (Doc. 85 at 7). But in the Eleventh Circuit, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Id.* at 1294. Ms. Scott could testify about what she told officers, eliminating two levels of hearsay. And as for the third level of purported hearsay—Ms. Scott's statements about what officers told her—it is unclear that they would be offered for the truth of matter asserted (that Mr. McBrayer was mentally unstable) instead of to show the officers' knowledge or belief about Mr. McBrayer's mental state. *See* Fed. R. Evid. 801 ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *United States v. Parry*, 649 F.2d 292, 295 (5th Cir. Unit B 1981) ("Using an out-of-court utterance as circumstantial evidence of the declarant's knowledge of the existence of some fact, rather than as testimonial evidence of the truth of the matter asserted, does not offend the hearsay rule."). Accordingly, the court will consider this fact in Mr. McBrayer's favor at this stage in the proceedings.

4

his deposition, Officer Edwards testified that he went to the apartment complex twice that night. (*See* Doc. 76-2 at 12) (testifying that no one identified Mr. McBrayer "the first time, but we were called back a second time"). It is reasonable to infer that the first time was in response to Ms. Scott's call, and that Officer Edwards was one of the officers who advised Ms. Scott that Mr. McBrayer was mentally unstable.

Following the officers' instructions, Ms. Scott called the police back when Mr. McBrayer returned later that night. (Doc. 80 at 7). This time, Officer Edwards, Officer Dan Tomlinson, and Corporal Howard Bishop went to the apartment complex to investigate. (Doc. 76-2 at 7, 12). Officer Edwards and Corporal Bishop knocked on Mr. McBrayer's door while Officer Tomlinson went around the back, but although Officer Tomlinson could see Mr. McBrayer inside, Mr. McBrayer did not answer the door. (*Id.* at 6–7). Corporal Bishop ordered the officers to return to "service," but as they were leaving, Officer Tomlinson reported that Mr. McBrayer had left his apartment. (*Id.* at 12–13). Officer Edwards and Officer Tomlinson approached Mr. McBrayer, who was by that time rummaging through the trunk of his car. (*Id.*).

Around this time, Officers Tomlinson and Edwards turned on their body cameras. The first thirty seconds of each recording is silent, but Officer Edwards has testified about what was said during that time and Ms. Flood does not dispute

5

Officer Edwards' testimony on that point. (*See* Doc. 91; *see also* Doc. 76-2 at 8; Doc. 81 at 2–3 ¶ 7). The videos show that as Mr. McBrayer walked back toward his apartment carrying a box cutter in his right hand, the officers approached him with Officer Tomlinson to the left and Officer Edwards to the right. (Doc. 76-2 at 7–8; Doc. 76-1 (Edwards Video) 00:00–00:26). When the officers got within a few feet of Mr. McBrayer, he "scream[ed] . . . 'I feel threatened'" and raised the box cutter in Officer Tomlinson's direction. (Doc. 76-2 at 8; *see* Doc. 76-1 (Tomlinson Video) at 00:13–00:30). He quickly became agitated, brandishing the box cutter and yelling that he was going home, to which the officers told him, "No, you're not." (Doc. 76-1 (Tomlinson Video) at 00:15–00:33; Doc. 76-1 (Edwards Video) at 00:22–00:28).

The officers, who pulled their guns when he raised the box cutter, repeatedly shouted for Mr. McBrayer to drop "the knife." (Doc. 76-1 (Tomlinson Video) at 00:33–00:41; Doc 76-1 (Edwards Video) at 00:23—00:50). Mr. McBrayer, pointing the knife at Officer Edwards, told him to get out of the way and said "I'm going home." (Doc. 76-1 (Edwards Video) at 00:38–00:42). Meanwhile, the officers continued to repeat their commands for Mr. McBrayer to drop the knife, and he continued to ignore those commands. (Doc. 76-1 (Tomlinson Video) at 00:35–00:41; Doc. 76-1 (Edwards Video) at 00:38–00:50).

Mr. McBrayer continued moving in the direction of his apartment, and Officer Edwards backed up as Mr. McBrayer got closer to him. (Doc. 76-1 (Tomlinson Video) at 00:33–00:41; (Doc. 76-1 (Edwards Video) at 00:23–00:50). As Mr. McBrayer moved toward Officer Edwards, Officer Edwards fired his gun five times, hitting Mr. McBrayer in the chest. (Doc. 76-1 (Tomlinson Video) at 00:41–00:50; Doc. 76-1 (Edwards Video) at 00:50–00:55). After Mr. McBrayer fell to the ground, he said: "I was walking to where I'm boarding." (Doc. 76-1 (Edwards Video) at 00:52–00:55). He died soon after.

The parties presented evidence about the type and amount of training Jacksonville Police Department officers receive in general and specifically with respect to the mentally ill. (*See* Doc. 76-2 at 5–6; Doc. 76-3 at 5, 11–12, 19; Doc. 76-4 at 64–66; Doc. 76-5; Doc. 80 at 11–13). For reasons the court will explain further below, the court will not recite that evidence here.

## II. DISCUSSION

The City moves for summary judgment on the basis that (1) a municipality may not be liable in the absence of a constitutional violation by one of its officers; (2) a municipality cannot be liable under a theory of *respondeat superior*; and (3) Ms. Flood cannot establish that any policy or custom caused the constitutional deprivation. (Doc. 77 at 15–16). Because the court agrees that Ms. Flood has not presented evidence that Officer Edwards violated Mr. McBrayer's constitutional

rights and, as a result, the City cannot be liable, the court will address only the first argument.

In deciding a motion for summary judgment, the court must determine whether, accepting the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Hamilton*, 680 F.3d at 1318. The United States Supreme Court has imposed strict limitations on municipal liability. *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). A city cannot be liable under § 1983 through the doctrine of *respondeat superior*. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). Instead, to hold a city liable for the actions of its officers, a plaintiff must show that the city had a custom or policy of excessive force or inadequate training or supervision. *Gold*, 151 F.3d at 1350–51.

But before examining a city's customs or policies leading to a constitutional injury, the plaintiff must show that one of the officers inflicted a constitutional injury on him. "If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Garczynski v. Bradshaw*, 573 F.3d 1158, 1170 (11th Cir. 2009) ("Analysis of a state entity's custom or policy is unnecessary, however, when no constitutional violation has

occurred."); *Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."). Accordingly, even though Ms. Flood no longer asserts a claim of excessive force against Officer Edwards, the court must determine whether a reasonable jury could find that Officer Edwards used excessive force against Mr. McBrayer.

This court "analyze[s] a claim of excessive force under the Fourth Amendment's 'objective reasonableness' standard." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). That means that, taking the facts in the light most favorable to the plaintiffs, the court must determine whether the use of force was "objectively reasonable . . . from the perspective of a reasonable officer on the scene." *Id.* (alteration in original) (quotation marks omitted).

The court considers several factors in determining whether a use of force was objectively reasonable. Those factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—

about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. For that reason, the court must examine the facts without the benefit of hindsight. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010).

Taking the facts in the light most favorable to Ms. Flood while also considering them from the perspective of a reasonable officer in Officer Edwards' position is a delicate balance. The court finds, however, that Ms. Flood has not presented evidence creating a genuine dispute of material fact about whether Officer Edwards used excessive force against Mr. McBrayer.

Officer Edwards was confronted with a man who had reportedly been shooting a BB gun at a car earlier in the day, was behaving strangely, yelling that he "felt threatened," brandishing a box cutter in his direction and toward another officer, disregarding repeated commands to drop "the knife," and approaching the officers in an attempt to get past them. From the videos it is clear that Mr. McBrayer was within a few feet of Officer Edwards when Officer Edwards shot him. A reasonable officer in Officer Edwards' position would have believed that Mr. McBrayer posed an immediate threat to him and Officer Tomlinson. *See Graham*, 490 U.S. at 396. The fact that a reasonable jury could find that Officer Edwards already knew or believed that Mr. McBrayer was suffering from a serious

10

mental illness does not change the determination that in that moment, the use of force was objectively reasonable.

This case bears a strong resemblance to the Eleventh Circuit's decision in *Shaw v. City of Selma*, 884 F.3d 1093 (11th Cir. 2018). In that case, police received an emergency call about an elderly mentally disturbed man named Ananias Shaw attempting to enter a restaurant with a knife. *Id.* at 1096–97. When the officers arrived, they found Mr. Shaw in an abandoned laundromat. *Id.* at 1097. Mr. Shaw picked up a hatchet and approached the officers, who drew their weapons and retreated, repeatedly telling him to put the axe down. *Id.* at 1097. They then followed Mr. Shaw as he walked away down the street holding the hatchet. *Id.* Eventually he turned and approached the officers, telling them to "Shoot it!" *Shaw*, 884 F.3d at 1097. One of the officers shot Mr. Shaw once in the chest, killing him. *Id.* The Eleventh Circuit concluded that, under the totality of the circumstances, "a reasonable officer could have believed that Shaw posed a threat of serious physical injury or death" when he advanced on the officer, holding a hatchet and yelling "Shoot it!" *Id.* at 110.

Although there are distinctions between this case and *Shaw*, those distinctions are not enough to change the outcome. As in *Shaw*, Mr. McBrayer was acting erratically, holding a weapon, refusing to comply with orders from the officers to drop the weapon, and approaching the officers. *See also Shaw*, 884

11

F.3d at 1100 (collecting other similar cases). A reasonable officer in that situation could have believed that Mr. McBrayer posed a threat to himself or to others.

Ms. Flood contends that other factors set out in *Graham* and elsewhere establish that Officer Edwards' use of force was not reasonable. (*See* Doc. 81 at 19–21, 28–31). He points out that Mr. McBrayer was mentally ill; had committed only the petty crime of property destruction; was attempting only to return to his own apartment; and could not have been resisting arrest or attempting to evade arrest because the officers had not arrested or attempted to arrest him. (*Id.*). Even accepting that all of those factors favor Mr. McBrayer, however, in the totality of the circumstances the threat that Mr. McBrayer posed to the officers outweighs them. *See Graham*, 490 U.S. at 396 (requiring courts to consider "whether the suspect poses an immediate threat to the safety of the officers or others"); *see also Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) ("The government had a weighty interest in protecting members of the public and police officers from the threat of force. Thus, where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, use of deadly force does not violate the Constitution.") (citation, quotation marks, and alteration omitted).

As the Eleventh Circuit wrote in *Shaw*, "[t]he shooting of a mentally ill man was tragic, as such shootings always are, but tragedy does not equate with

unreasonableness." *Shaw*, 884 F.3d at 1101. Under the circumstances, Officer Edwards did not act unreasonably when he used deadly force against Mr. McBrayer. And absent an underlying constitutional violation by Officer Edwards, Ms. Flood cannot hold the City liable for failure to train. *See Heller*, 475 U.S. at 799 ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); *Garczynski*, 573 F.3d at 1170; *Rooney*, 101 F.3d at 1381.

### III. CONCLUSION

The court **WILL GRANT** the City's motion for summary judgment and **WILL ENTER SUMMARY JUDGMENT** in favor of the City and against Ms. Flood.

The court will enter a separate order consistent with this opinion.

**DONE** and **ORDERED** this April 15, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE